UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIC RAYMONE BROOKS,

       Petitioner,

v.                               CASE NO. 11-12323
                                    HONORABLE VICTORIA A. ROBERTS

THOMAS BIRKETT,

       Respondent.
_____/

**OPINION AND ORDER
DENYING THE HABEAS CORPUS PETITION,
DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, BUT
GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

Petitioner Eric Raymone Brooks filed a petition for the writ of habeas corpus challenging his state conviction for armed robbery, Mich. Comp. Laws § 750.529. He alleges that the prosecution relied on perjured testimony to obtain his conviction and that his trial attorney was ineffective for failing to obtain his and the complainant's cellular (cell) phone records before trial. The Court denies the petition because the state court's adjudication of these claims on the merits was objectively reasonable.

## I. Background

The armed robbery charge arose from a complaint that Petitioner robbed a co-worker at gunpoint at her home in Lansing, Michigan on Sunday morning, January 7, 2007. Petitioner was tried before a jury in Ingham County Circuit Court where the following evidence was presented.

**A.  Prosecution Witnesses**

### Diane Harvell

The complaining witness, Diane Harvell, testified that she met Petitioner at work in 2006.  The two of them and Petitioner's mother worked at Evolve Teleservices.  A few days before their payday on January 5, 2007, Petitioner asked her whether she wanted to purchase a television from him.  She agreed to purchase the television, and on Saturday, January 6, 2007, Petitioner appeared unannounced at her home.  She told him that she did not have the money for the television, but that she would purchase it on the following day after she went to the ATM.  On Sunday, January 7, 2007, Petitioner returned to her home in a white Ford car with a female passenger.  He knocked on her door and asked her whether she still wanted the television.  After she responded affirmatively, Petitioner went to the car, and she went upstairs to get the money.  She got $743 and went back downstairs.  Petitioner was standing in her living room without the television, but he went back outside when a car horn blew.  He said something to the passenger in the car.   Then he returned to her house and pulled a gun out of his coat pocket.  He pressed the gun firmly against her body and told her three or four times to "give it up."  She opened her hand when he moved the gun up to her collar bone and said "give it up" one more time.  He took her money and ran out of the house.  She went outside and, as she was copying the license plate number of the car Petitioner was driving, he yelled to her, "I'm going to bring your money back."

She did not report the incident to the police because she did not know Petitioner's last name.  She called her workplace in an effort to determine Petitioner's last name, but the supervisor had left.  So, she called back and left a message for

Petitioner's mother, Charm Brooks, to call her.  She identified herself as Lisa Brown because she was new on the job and did not want to have her job involved.  When Ms. Brooks returned the call, she (Harvell) explained who she was and informed Ms. Brooks that Petitioner had robbed her at gunpoint.  Ms. Brooks was upset and apologized, saying that Petitioner had been causing her a lot of problems, that he was on drugs, and that he had a gambling problem.  Ms. Brooks promised to try to get her money back and asked her not to call the police because Petitioner was leaving town and she would not have to deal with him anymore.

  Ms. Harvell returned to work on Monday, January 8, 2007.  Petitioner was not there, but his mother, Charm Brooks, approached her and threatened to do something to her if anything happened to Petitioner.  Petitioner returned to work on Wednesday, January 10, 2007, and gestured at her.  She was terrified and decided that she had to do something.  She spoke with the supervisor of human resources who gave her Petitioner's surname and encouraged her to get a PPO.  She left the building and filed a police report.  In subsequent days, Petitioner tried to intimidate her by pretending to shoot her with a gun, but on January 19, 2007, the police arrested Petitioner at work.  Ms. Harvell was suspended indefinitely after Petitioner's arrest for creating a hostile work environment; she never got her money back from Petitioner.

  Defense counsel asked Ms. Harvell on cross-examination whether she and Petitioner had any conversations about the sale of marijuana and whether Petitioner had taken any marijuana or a garbage bag from her on the day in question.  She replied that she never discussed selling marijuana with Petitioner and that he did not take marijuana or a garbage bag from her home on January 7, 2007.  Later, defense counsel

asked Ms. Harvell whether she had called Petitioner during the three days between the alleged robbery and the day that she reported the incident to the police. She answered, "No." On re-direct examination, Ms. Harvell testified that she did not keep marijuana in her house and that there was no marijuana there on January 7, 2007, or at any other time.

### Herman Watts

Ms. Harvell's neighbor, Herman Watts, testified that he saw a small white car parked by Ms. Harvell's house on the day of the robbery. He denied seeing any type of activity suggesting that Ms. Harvell sold drugs or had drugs in her home.

### Tara May

Tara May was a trainer at Evolve Teleservices. She testified that Ms. Harvell told her about the robbery and that, one day, she observed Charm Brooks talking aggressively to Ms. Harvell and saying something like, "Don't talk to him" or "You'll deal with me." Ms. May thought that Ms. Brooks was trying to intimidate Ms. Harvell by letting Ms. Harvell know that she (Brooks) ruled the workplace and that Ms. Harvell did not have any power there.

### Paul Mickley

Paul Mickley was the director of human resources at Evolve Teleservices. He testified that Petitioner did not work on January 8 or 9, 2007, and that, when Petitioner returned to work on January 10, 2007, he was suspended for five days for a workplace violation that had nothing to do with the alleged robbery. At about the same time, Ms. Harvell brought something to his attention. He responded by telling Ms. Harvell that, if

there was an issue outside the workplace, she should seek the proper authorities. When Petitioner returned to work on January 18 or 19, 2007, Tara May informed Mr. Mickley about a disagreement between Ms. Harvell and Petitioner. Mr. Mickley then instructed Petitioner and Ms. Harvell to keep their personal disagreements out of the workplace. Ms. Harvell was suspended for creating a disturbance, although she was a good employee. Mickley was unaware of Ms. Harvell providing drugs or having drugs in the workplace, and her suspension had nothing to do with drugs. And even though he did not recall Ms. Harvell asking him for Petitioner's last name, he conceded it was possible that she did ask him and that he forgot about it.

### Ron Seyka

Detective Ron Seyka of the Lansing Police Department testified that, on January 19, 2007, Ms. Harvell identified Petitioner in a photo array as the man responsible for the armed robbery. He did not find it suspicious when Ms. Harvell said the crime was not drug-related.

**B. Defense Witnesses**

### Colin Kacmarsky

Officer Colin Kacmarsky testified that Ms. Harvell reported the robbery to him on Wednesday, January 10, 2007. Ms. Harvell informed him that she did not contact the police for three days because she intended to let God sort it out and because she wanted to determine the suspect's last name before reporting the incident. Officer Kacmarsky thought that was unusual because robbery victims usually report a robbery immediately. Although Ms. Harvell was adamant about the crime not being drug-

related, Officer Kacmarsky was suspicious because, in his experience, there is often a lag in reporting a crime when the crime is drug-related. The lag in time enables the person to concoct a story. He could not recall another time when someone delayed reporting a crime simply because they did not know the suspect's surname. Usually, people tell the police what they know and the police proceed with the information they have. Although he remained suspicious, there was no evidence that drugs were involved in the crime.

### Charm Brooks

Charm Brooks testified that Petitioner was her son and that, on January 7, 2007, she returned Diane Harvell's telephone call. Ms. Harvell informed her that Petitioner robbed her of seven pounds of marijuana. Ms. Harvell offered to give her $700 if Petitioner returned the marijuana. During a subsequent call, Ms. Harvell offered $1,000 for the return of the marijuana. When Ms. Brooks confronted Petitioner with the accusation, Petitioner informed her that he was with his girlfriend at the time and was not in Ms. Harvell's neighborhood when the incident occurred.

Ms. Brooks denied telling Ms. Harvell that her son had a gambling problem and was a drug addict or that she would try to return the money to Ms. Harvell. She also denied threatening Ms. Harvell when the two of them returned to work on the Monday after the crime.

### Tammy Lawrence

Ms. Lawrence testified that she was Petitioner's friend, and that, after 10:30 a.m. on January 7, 2007, she and Petitioner went to a woman's house in her white Ford. There was no television in the car at the time. Petitioner went inside the woman's

house for ten or fifteen minutes and then came out of the house with a white garbage bag, which appeared to contain something. Petitioner was calm when he left the house, and Ms. Harvell did not appear to be upset. The two of them were talking as though they were friends. Although Petitioner told Ms. Harvell that he would be back in twenty minutes, he did not return to Ms. Harvell's home.

Ms. Lawrence denied telling the defense investigator, Owen Deatrick, that she did not recall any of the locations or names of the people she met when driving Petitioner around. She also denied recalling the event in question after Petitioner's mother refreshed her memory.

**C. The Rebuttal Witness**

### Owen Deatrick

Private investigator Owen Deatrick testified that the former defense attorney hired him to investigate the events of January 7, 2007. When interviewing Tammy Lawrence over the telephone on March 9, 2007, Ms. Lawrence stated that she did not recall January 7 and that she had no personal recollection of the location where the alleged incident occurred or the names of the people that Petitioner met during that time period. After the interview with Ms. Lawrence, Charm Brooks called Mr. Deatrick and inquired about the questions he had posed to Ms. Lawrence and the answers Ms. Lawrence gave. Ms. Brooks then informed him that Ms. Lawrence currently was able to recall what had taken place. Ms. Brooks wanted Mr. Deatrick to arrange an interview with both her and Ms. Lawrence present. Ms. Brooks demanded that she be present to ensure that Mr. Deatrick asked only proper questions. He (Deatrick) called Ms. Lawrence at least ten times to arrange a second interview, but she did not return his

calls and there was no second interview.

### D. The Verdict, Sentence, Post-Conviction Motions, and Appeal

The defense theory was that there was no armed robbery and that Ms. Harvell fabricated the incident. The implication was that Ms. Harvell contrived the charge because Petitioner took her marijuana without reimbursing her for it.

The jury's deliberations spanned two days. After approximately two hours of deliberations, the jurors asked for the definitions of "force" and an "investigative report." They also requested the police report and the testimony of Ron Seyka and Diane Harvell. The trial court excused the jurors for the day without answering their questions.

On the following day, the trial court addressed the jurors' questions, but, after another six hours of deliberations, the jurors reported that they were unable to agree on a verdict. The trial court encouraged the jurors to reach an agreement without violating their own judgments. About three hours later, the jury found Petitioner guilty, as charged, of armed robbery.

Petitioner maintained his innocence at the sentencing on October 24, 2007. He claimed that Ms. Harvell gave him a trash bag of marijuana on credit and that her accusation against him was the result of him not being able to repay her for the marijuana. The trial court sentenced Petitioner as a habitual offender, third offense, to imprisonment for 96 to 240 months (eight to twenty years). Petitioner filed two post-conviction motions: one for a new trial and an evidentiary hearing and one for release of the complainant's cell phone records. The trial court denied the motions without holding an evidentiary hearing.

Petitioner appealed as of right, but the Michigan Court of Appeals affirmed his conviction and sentence in an unpublished, *per curiam* decision. *See People v. Brooks*, No. 282355 (Mich. Ct. App. Aug. 13, 2009). On March 11, 2010, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. *See People v. Brooks,* 485 Mich. 1115; 780 N.W.2d 250 (2010) (table).

**E. The Habeas Petition and Responsive Pleading**

On May 26, 2011, Petitioner filed his habeas corpus petition through counsel. He alleges that the complainant committed perjury at his trial and that his trial attorney was ineffective for failing to obtain his and the complainant's cell phone records. Petitioner also contends that, at a minimum, he is entitled to an evidentiary hearing. Respondent Thomas Birkett urges the Court to deny relief.

## II.  Standard of Review

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, __ U.S. __, __, 131 S. Ct. 770, 783 (2011). Pursuant to § 2254, the Court may not grant a state prisoner's application for the writ of habeas corpus unless the state court's adjudication of the prisoner's claims on the merits

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., opinion of the Court for Part II). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

"AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and 'demands that state-court decisions be given the benefit of the doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)." *Renico v. Lett*, 559 U.S. 766, 773 (2010). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for

10

fairminded disagreement." *Id.* at 786-87.

### III. Discussion

**A. Alleged Perjury**

Petitioner alleges that the prosecution violated his constitutional right to due process by using perjured testimony to obtain his conviction. The alleged perjury consists of Diane Harvell's testimony that she did not call Petitioner after the alleged robbery on January 7, 2007, or any time between then and January 10, 2007, when she reported the incident to the police. (Trial Tr. Vol. I, 136, Sept. 24, 2007.) Although Petitioner concedes that the prosecutor did not knowingly use perjured testimony, he claims that the prosecutor failed to correct the perjured testimony when it occurred.

The Michigan Court of Appeals adjudicated Petitioner's claim on the merits and stated that there was no evidence the prosecutor knowingly presented false and perjured testimony. The Court of Appeals noted the lack of evidence substantiating Petitioner's claim that the identified cell phone numbers belonged to him and the victim. The Court of Appeals also stated that, even if the records were accepted as accurate, they did not substantiate or negate the victim's or Petitioner's differing versions of whether an armed robbery or a soured drug deal occurred.

**1. Clearly Established Federal Law**

The federal definition of perjury is "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). Prosecutors, as representatives of the state, may not deceive a court and jurors by

11

eliciting false evidence or by allowing false testimony to go uncorrected when it appears. *Giglio v. United States*, 405 U.S. 150, 153 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959). "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103 (1976). The United States Court of Appeals for the Sixth Circuit has

> fashioned a three-part test for determining whether there was a denial of due process through the use of false testimony:
>
>> In order to establish prosecutorial misconduct or denial of due process, the defendants must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. The burden is on the defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony.
>
> *Brooks* [*v. Tennessee*, 626 F.3d 878, 894-95 (6th Cir. 2010)] (quoting *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir.1998)). Testimony is material only if there is a reasonable likelihood that it affected the judgment of the jury. *Id.* at 895.

*Peoples v. Lafler*, 734 F.3d 503, 515-16 (6th Cir. 2013).

### 2. Application

#### a. False Statement

The first element Petitioner must satisfy is that the statement in question was actually false. The disputed statement here is Ms. Harvell's statement that she did not call Petitioner after the alleged robbery on Sunday, January 7, 2007, or any other time up to Wednesday, January 10, 2007, when she reported the incident to the police. (Trial Tr. Vol. I, 136, Sept. 24, 2007.) As "proof" that this was false testimony, Petitioner points to cell phone records for number 517-908-2691, which he claims was his cell

phone number at the time of the incident in question. According to Petitioner, his cell phone records for number 517-908-2691 indicate that Ms. Harvell called him three times on January 7, 2007: at 1:42:23 p.m., at 2:26:18 p.m., and at 4:20:42 p.m. *See* Pet. for Writ of Habeas Corpus, App. E .

Although Appendix E does indicate that there were incoming calls to number 517-908-2691 at 1:42:23 p.m., 2:26:18 p.m., and 4:20:42 p.m. on January 7, 2007, there is no indication on the document that it is Petitioner's cell phone record. The subscriber is listed as John Doe with a birth date of January 30, 1974. Petitioner's full name is Eric Raymone Brooks, and the Michigan Department of Corrections lists his date of birth as November 27, 1971.[1]

Petitioner also has not shown that the incoming calls shown in Appendix E came from Ms. Harvell. The incoming number on the date and times in question is 517-712-7037, but, at a pretrial hearing on August 15, 2007, Petitioner stated that Ms. Harvell's telephone number was 517-862-9713. *See* Motion Hr'g, Aug. 15, 2007, at 16. Petitioner claims that the discrepancy in the telephone numbers is due to his reliance on police records at the hearing on August 15, 2007. He asserts that he was not relying on his memory at the time and, instead, was relying on Ms. Harvell's statement to a police officer that her cell phone number was 517-862-9713. But the only indication that Ms. Harvell's telephone number was 517-712-7037 at the time is Petitioner's self-serving affidavit. *See* Pet. for Writ of Habeas Corpus, Appendix G.

The cell phone records attached to the habeas petition fail to prove that Ms.

---

[1]*See* Michigan Department of Corrections Offender Tracking Information System, http://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=228164.

Harvell called Petitioner three times on January 7, 2007, and that she lied at trial when she denied calling Petitioner after the incident on January 7, 2007. Thus, Petitioner fails to satisfy the first element of perjury.

### b. Materiality

The second element of a perjury claim requires showing that the allegedly false statement was material evidence. The critical issue at trial was whether Petitioner used force, violence, or frightening tactics to take money or property from Ms. Harvell while armed with a weapon. Because the allegedly false testimony about not calling Petitioner from January 7 to January 10, 2007, did not create a reasonable doubt as to whether the prosecution proved the elements of the charged crime, there is not a reasonable likelihood that the testimony affected the jury's judgment. Petitioner therefore did not prove the materiality element of a perjury claim.

### c. The Prosecutor's Knowledge

The third and final element that Petitioner must prove to prevail on his perjury claim is that the prosecution knew the disputed statement was false. At trial, there was no reason to believe that Ms. Harvell was lying when she denied calling Petitioner after the crime, and there is nothing in the record to suggest that the prosecutor knew Ms. Harvell's testimony was false. Petitioner therefore fails to satisfy the third element of a perjury claim.

### 3. Conclusion on the Perjury Claim

Petitioner failed to prove the three elements of a perjury claim, and even though he seeks an evidentiary hearing to establish additional facts, this Court is limited to a

review of the record that was before the state court. *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 464 (6th Cir.) (citing *Cullen v. Pinholster*, __ U.S. __, __, 131 S. Ct. 1388, 1398 (2011)), *cert. denied sub nom Keeling v. Brunsman*, __ U.S. __, 133 S. Ct. 141 (2012).  The Court therefore denies Petitioner's request for an evidentiary hearing and declines to issue the writ of habeas corpus on the basis of Petitioner's first claim. The state appellate court's rejection of Petitioner's perjury claim was objectively reasonable.

**B.  Trial Counsel**

Petitioner's second and final claim alleges that his trial attorney was ineffective for failing to obtain his and Ms. Harvell's cell phone records before trial.  Petitioner asserts that his attorney had a duty to investigate the facts and that counsel waited too long to request the complainant's records.  As for his own phone records, Petitioner maintains that his attorney could have obtained the records with a little effort even though he had a prepaid cell phone.

The state trial court determined that trial counsel's performance did not fall below an objective standard of reasonableness.  The Michigan Court of Appeals agreed and opined that the trial court did not err when it determined that counsel's failure to produce cell phone records did not deprive Petitioner of effective assistance of counsel.   **1. Clearly Established Federal Law**

The Constitution "does not guarantee the right to perfect counsel; it promises only the right to effective assistance . . . ." *Burt v. Titlow*, __ U.S. __, __, 134 S. Ct. 10, 18 (2013).  To prevail on his claim, petitioner must show that his attorney's performance

was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Hodges v. Colson*, 727 F.3d 517, 541-42 (6th Cir. 2013). "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland v. Washington*, 466 U.S. at 687.

An attorney's performance is deficient if "in light of all the circumstances, the identified acts and omissions were outside the wide range of professionally competent assistance." *Strickland v. Washington*, 466 U.S. at 690. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.

To satisfy the prejudice prong of the *Strickland* test, Petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' " but "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 131 S. Ct. at 792 (quoting *Strickland v. Washington*, 466 U.S. at 693).

### 2. Application

Petitioner blames his trial attorney for not obtaining his (Petitioner's) cell phone records. Petitioner contends that his appellate attorney was able to acquire his cell phone records with very little effort and that trial counsel's failure to obtain the records is inexplicable.

The cell phone records attached to the habeas petition do not appear to be Petitioner's phone records. They do not list Petitioner as the subscriber, and they do not reflect his date of birth. Because the records are inconclusive, Petitioner was not prejudiced by his trial attorney's failure to acquire the records before trial.

Petitioner also blames his attorney for not acquiring the complainant's cell phone records. Although he admits that he may have given his attorney the wrong number for the complainant at the pretrial hearing on August 15, 2007, he contends that, if trial counsel had pursued the matter sooner, counsel could have determined the correct number with Petitioner's and his mother's help. Petitioner claims that the complainant's cell phone records would have established that (1) the complainant called him three times after the alleged robbery in an effort to have Petitioner return her marijuana before she called the police and (2) she perjured herself at trial when she denied calling Petitioner after the alleged robbery. Petitioner asserts that this evidence would have supported the defense theory that the incident in question was not an armed robbery, but a drug dispute.

Petitioner merely speculates that the complainant's cell phone records would reflect calls to him between January 7, 2007, and January 10, 2007. As previously explained, the cell phone records that Petitioner attached to his habeas petition are inconclusive as to whether they are his phone records and whether the calls attributed to the complainant are actually the complainant's cell phone number.

Defense counsel, moreover, stated at the pretrial hearing on August 15, 2007, that he and the defense investigator would do their best to secure the complainant's records. It was not unreasonable for the state court to conclude from trial counsel's

comment "that [his] best efforts could not uncover records reflecting that Ms. Harvell placed any calls to [Petitioner's] cellular telephone during the time period in question." Opinion and Order denying Petitioner's motion for new trial, at 5-6.

Petitioner has not established that his attorney's performance was deficient and that the deficient performance prejudiced the defense. He has no right to relief on his ineffective-assistance-of-counsel claim.

## IV.  Conclusion

The state appellate court's adjudication of Petitioner's claims on the merits was not contrary to, or an unreasonable application of Supreme Court precedent, and this Court is precluded from holding an evidentiary hearing on Petitioner's claims. Accordingly, the petition for a writ of habeas corpus [ECF No. 1] is **DENIED**.

## V.  Certificate of Appealability

Petitioner may not appeal this decision unless a district or circuit judge issues a certificate of appealability, 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1), and a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). When, as here, "a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must

demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. at 484.

Reasonable jurists would not debate the Court's assessment of Petitioner's claims, nor conclude that the issues deserve encouragement to proceed further. The Court therefore declines to issue a certificate of appealability. Petitioner nevertheless may proceed *in forma pauperis* on appeal because an appeal could be taken in good faith. 28 U.S.C. § 1915(a)(3).

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated: January 9, 2014

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on January 9, 2014.

S/Holly A. Monda for Carol A. Pinegar
Deputy Clerk

19